IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **YAHAIRA PEREZ, Executrix of the Estate of Marvin Yamar Perez** | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 09-4298 |
| **THE CITY OF PHILADELPHIA** | : | |
| Defendant. | : | |

DuBOIS, J.                                                                                                                                       April 5, 2010

**M E M O R A N D U M**

**I. INTRODUCTION**

Marvin Yamar Perez ("Perez") died on September 23, 2007 after waiting for an ambulance to arrive following a 911 call. Plaintiff Yahaira Perez, the executrix of Marvin Perez's estate, filed the instant suit under 42 U.S.C. § 1983 alleging violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. Presently before the Court is the City of Philadelphia's ("the City" or "Philadelphia") Motion to Dismiss. The Court heard oral argument on March 11, 2010. For the reasons discussed below, the motion is granted.

**II. BACKGROUND**[1]

    **A. Philadelphia's Emergency Medical Services**

Philadelphia offers its citizens emergency medical services ("EMS"). (Compl. ¶ 11.) The

---

[1] During the March 11, 2010 oral argument on the motion, plaintiff's counsel presented an incident history report listing the time and duration of Veronica Perez's 911 calls. By agreement of counsel, this document is incorporated into the Complaint by reference. In this memorandum, time references relating to the 911 call are based on that report. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). All other facts are taken from the Complaint and presented in the light most favorable to plaintiff.

City directs its citizens to call 911 to request assistance for any and all medical emergencies. (Compl. ¶13.) Seventy-five percent of such calls are for non-life threatening emergencies. (Compl. ¶ 13.) Upon calling 911 in situations where medical attention is required, an operator tells the caller that help is on the way and to await the arrival of emergency medical personnel. (Complaint ¶¶ 13-14.)

If the dispatch of EMS is required, a 911 operator contacts the communication center of the Philadelphia Fire Department. (Compl. ¶ 15.) The communication center then dispatches EMS to the location. (Compl. ¶ 18.) Neither the 911 nor the Fire Department dispatcher operators are permitted to contact private ambulance companies. (Complaint ¶¶ 17, 20.)

The Philadelphia Fire Department has three types of units that can be dispatched to render assistance for medical emergencies. (Compl. ¶ 19.) A First Responder Unit (FRU) is staffed with fire fighters who are also trained as Emergency Medical Technicians (EMTs). (Compl. ¶ 21.) An FRU can provide basic life support services (BLS) but can not transport a patient to the hospital. (Compl. ¶¶ 22, 23.) The second type of unit, a Basic Life Support Unit (BLSU), is staffed by two EMTs, provides the same BLS services as an FRU, travels in an ambulance, and can transport a patient to the hospital. (Compl. ¶¶ 26 - 29.) The third type of unit, an Advanced Life Support Unit (ALSU) travels in an ambulance staffed with two paramedics and can provide advanced life support services (ALS) in addition to BLS. (Compl. ¶¶ 30, 31). ALSUs can intubate patients; FRUs and BLSUs cannot. (Complaint ¶¶ 19-31).

The Philadelphia Fire Department receives an average of 100 emergency calls per eight hour shift. (Compl. ¶ 32.) At any given time, four operators are responsible for EMS dispatch. (Compl. ¶¶ 34, 35.) Although the number of emergency calls rose from 136,887 in 1994 to 209,654 in 2006,

the City did not increase the number of operators responsible for these calls. (Compl. ¶¶ 34, 35.) In 2007 at the time of Marvin Yamar Perez's death, as in 1994, there were four operators responsible for EMS dispatch. (Compl. ¶ 36.)

In 2007, the City had forty-two ALSUs to provide emergency services, only 27 of which were available after midnight. (Compl. ¶ 38.) In that year, there were significant periods of time, up to two hours, during which no ALSUs were available. (Compl. ¶ 39.) Based on its population, Philadelphia requires seventy ALSUs to provide safe and reasonable emergency medical services. (Compl. ¶ 40.) Due to the unavailability of ALSUs at times, persons in need of intubation, medication, or transport did not receive those services within the national standard time of eight minutes. (Comp. ¶¶ 43-46.)

Despite knowing that its emergency response services are inadequate, the City of Philadelphia made no changes to its system. (Compl. ¶¶ 49-54.)

**B. The Death of Marvin Yamar Perez**

Perez, age seven, suffered from pediatric asthma, a disease of the respiratory system which causes swelling and narrowing of the airways. (Compl. ¶ 55.) On September 23, 2007, Perez experienced an asthma attack while in his family's home at 4950 Bingham Street in Philadelphia. (Compl. ¶¶ 56, 58.) The Perez family home is approximately 1.7 miles from the nearest medical facility, St. Christopher's Hospital for Children. (Compl. ¶ 57.)

Veronica Perez called 911 at 8:32:38 P.M. to report the emergency and request medical assistance, informing the operator that Perez was seven years old and could not breathe due to an asthma attack. (Compl. ¶¶ 59, 60.) The operator told Veronica that "help was on the way." (Compl. ¶ 61). The call ended at 8:33:31 P.M. and was entered in the system at 8:33:51 P.M. When there

was no immediate assistance Veronica called 911 at 8:35:01 P.M., once again telling the operator that Perez was having an asthma attack. (Compl. ¶ 62.) The operator told her, "You need to stop calling. They are on their way." (Compl. ¶¶ 62, 63.) The second call ended at 8:35:20 P.M. An ambulance was dispatched at 8:34:37 P.M., was in route at 8:35:51 P.M., and arrived at the Perez's home at 8:40:02 P.M.

Relying on these assurances from the 911 operators, Veronica and Yahaira did not immediately take Perez to St. Christopher's Hospital after the first call to 911. (Compl. ¶¶ 64, 69-72.) Instead, they waited for several minutes after the second call to 911 before transporting him to the hospital in a private automobile. (Compl. ¶ 64.) An FRU arrived at Perez's home soon after his family left for the hospital. (Compl. ¶ 65.) Perez arrived at St. Christopher's Hospital for Children at approximately 8:36 P.M. (Compl. ¶ 67.) He was pronounced dead at 9:34 P.M. (Compl. ¶ 68.)[2]

"[B]ut for the false assurances of the 911 operators" Veronica and Yahaira would have transported Perez to the hospital immediately after the initial 911 call. (Compl. ¶ 72.) Immediate transportation would have saved Perez's life. (Compl. ¶ 72.)

Deficiencies in the Philadelphia's emergency response system were reported to the City before Perez's death. (Compl. ¶ 76.) The City knew, or should have known, that its medical response system could not respond to medical emergencies within the standard national response time. (Compl. ¶ 73.) The maintenance of this deficient system created the danger that caused Perez's death. (Compl. ¶ 75.)

---

[2] The Complaint states that plaintiff waited seven to ten minutes after the second 911 call before transporting Perez to the hospital and that the FRU arrived "approximately twenty minutes" after the first 911 call. (Compl. ¶¶ 64, 65.) This time frame contradicts the incident history report incorporated into the Complaint, which states that the time between the first call and the arrival of the ambulance was approximately eight minutes. Because the report states that the second call ended at 8:35:20 P.M., it also contradicts the allegation in the Complaint that Perez arrived at the hospital at approximately 8:36 P.M.

Despite knowledge of the system's deficiency, the City instructed its 911 operators, through training, policies and procedures, to assure callers that help is on the way. (Compl. ¶ 74.) In addition, the City adopted and maintained a policy of providing a deficient public emergency response system that also prevented private rescuers from responding. (Compl. ¶ 77.) Finally, the City had a policy and/or custom of inadequately and improperly investigating citizen complaints regarding the slow response time of EMS. (Compl. ¶ 78.)

The Complaint avers that the City of Philadelphia, through its policies, caused Perez's death in violation of his substantive due process right to bodily integrity protected by the Fourth and Fourteenth Amendments to the United States Constitution. Presently before the Court is defendant's Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### III. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that, in response to a pleading, a defense of "failure to state a claim upon which relief can be granted" may be raised by motion. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff . . . ." Phillips v. County of Allegheny, 515 F.3d 224, 231, 233 (3d Cir. 2008) (internal quotations omitted).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level . . . .'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). To satisfy the

plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In Twombly, the Supreme Court utilized a "two-pronged approach" which it later formalized in Iqbal. Iqbal, 129 S. Ct. at 1950; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Under this approach, a district court first identifies those factual allegations which constitute nothing more than "legal conclusions" or "naked assertions." Twombly, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded. Iqbal, 129 S. Ct. at 1950. The court then assesses "the 'nub' of the plaintiff['s] complaint – the well-pleaded, nonconclusory factual allegation[s]. . . to determine" whether it states a plausible claim for relief. Id.

## IV. DISCUSSION

42 U.S.C. § 1983 provides, in part, that

[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of a State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

This statute does not create substantive rights; rather, it provides a remedy for violations of rights established elsewhere. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). In order to state a claim under § 1983, a plaintiff must allege that a person acting under color of state law caused a deprivation of a right secured by the Constitution. See Parratt v. Taylor, 451 U.S. 527, 535 (1981); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141

(3d Cir. 1995).

Municipalities are "persons" who may be liable under § 1983. <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 690 (1978). In order to state a § 1983 claim against a municipality, plaintiff must allege (1) a constitutional injury (2) that was caused when the municipality took action pursuant to a custom or policy. <u>Collins v. City of Harker Heights, Texas</u>, 503 U.S. 115, 120 (1992).

Plaintiff alleges deprivation of the due process right to liberty. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 2. This clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 195 (1989).

<u>DeShaney</u> involved the pathetic case of four-year old Joshua DeShaney, who was beaten so severely by his father that he suffered permanent and profound retardation. <u>Id.</u> at 193. Authorities in the Winnebago County Department of Social Services ("Winnebago") were aware that Joshua was being abused by his father. <u>Id.</u> at 192. In fact, they at one point temporarily removed Joshua from the custody of his father after Joshua was admitted to a hospital with multiple bruises and abrasions. <u>Id.</u> Returned to his home after an agreement was reached with the father, Joshua's continued abuse was reported by a Winnebago caseworker who did nothing to intervene. <u>Id.</u> at 192-93. After Joshua's father finally beat the boy so badly he suffered permanent injury, Joshua and his mother brought suit against Winnebago under § 1983, alleging that it violated Joshua's substantive

due process right to liberty by failing to intervene. Id. at 193. The Supreme Court affirmed the granting of Winnebago's motion for summary judgment, holding that the Constitution is not violated simply because the state fails to act to protect one of its citizens. Id. at 202.

There are two exceptions to the DeShaney ruling. First, a state may be liable under the "state-created danger exception" when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003). Second, the state may be liable when it takes control of an individual and enters into a "special relationship." See, e.g., Youngberg v. Romeo, 457 U.S. 307 (1982) (state has duty to ensure safety of involuntarily-committed mental patients); Estelle v. Gamble, 429 U.S. 97 (1976) (state has duty to provide medical care to inmates). Plaintiff argues that she states a claim under both of these exceptions.

**A. Plaintiff's Claim Under the State-Created Danger Exception**

The substantive due process right to be free from state-created danger stems from the Supreme Court's opinion in Deshaney. In determining whether the state could be held liable for failing to protect Joshua DeShaney from his abusive father, the court found it important that "while the state may have been aware . . . of dangers . . . *it played no part in their creation, nor did it do anything to render [plaintiff] more vulnerable to them*." 489 U.S. at 201 (emphasis added). Several courts of appeals, including the United States Court of Appeals for the Third Circuit, have interpreted this sentence of the opinion to mean that a "state may be liable for constitutionally protected rights, even in the absence of a special relationship with an individual, when the state, through its affirmative conduct, creates or enhances a danger for the individual." Brown v. Pennsylvania Dep't of Health Emergency Medical Servs. Training. Inst., 318 F.3d 473, 478 (3d Cir.

2003). The four elements of such a state-created danger claim are

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actors acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions . . . ; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Sanford v. Stiles, 456 F.3d 298, 304-305 (3d Cir. 2006).

Defendant's motion to dismiss relies on Brown, 318 F.3d 473. In that case, one-year old Shacquiel Douglas choked on a grape. Id. at 475. His aunt, Angela Morris, called 911 and was told by the operator that "rescue is gonna come help you." Id. at 476. Morris called four minutes later to determine when EMTs would arrive. Id. The operator told Morris that "rescue was on the way." Id. Morris called a third time and was again told that help was on the way. Id. Help came ten minutes after the initial 911 call. Id. This was too late for Douglas, who died two days later of asphyxiation. Id. Douglas's parents filed a § 1983 action against the City of Philadelphia based on a state-created danger theory of liability. They charged that the City had adopted a policy or custom of providing inadequate training and support to its 911 operators.

The Third Circuit affirmed the district court's order granting the City's motion for summary judgment. It first held that "there is no federal constitutional right to rescue services, competent or otherwise." Id. at 478. It then went on to hold that "[i]t is not enough that a municipality adopted with deliberate indifference a policy of inadequately training its officers. There must be a direct causal link between the policy and a constitutional violation." Id. at 483. Because "[t]he City was under no constitutional obligation to provide competent rescue services," the court concluded that even if it accepted all of plaintiffs allegations as true, "they would still have failed to establish that

the City's policies caused *constitutional* harm." Id. (emphasis in original).

Defendant argues that Brown requires dismissal of plaintiff's Complaint. The Court disagrees. The facts of Brown are similar to the facts alleged in the Complaint, but the plaintiffs in that case were arguing that Philadelphia's policy or custom of providing incompetent rescue services was, by itself, an unconstitutional state-created danger. The Brown court was not asked to address whether reliance on a 911 operator's assurances that "rescue is gonna come help you" and that "rescue was on the way" increased the danger to Douglas. Plaintiff's Complaint in this case squarely presents this unanswered question. She alleges not that she has a Constitutional right to competent medical services, or that inadequate provision of those services amounted to a state-created danger. Instead, plaintiff avers that the City's policy or custom of telling 911 operators to say that help is on the way when it is not, while refusing to call private ambulance companies that might be able to help, imposes a state-created danger by inducing reliance that limits the plaintiff's freedom of action. (Compl. ¶¶ 72 - 79.)

### 1. The Affirmative Act Element

Brown aside, plaintiff's Complaint must be dismissed if the facts alleged do not constitute the "affirmative act" required as the fourth element of a state-created danger theory. A plausible state-created danger claim requires an allegation that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Stanford, 456 F.3d at 304-05. Liability accrues under a state-created danger theory "upon states' *affirmative acts* which work to the plaintiffs' detriment in terms of exposure to danger." Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006) (emphasis in original). Unfortunately, distinguishing between affirmative acts and failures to act is

far from easy:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1374 (quoting Bowers v. Devito, 686 F.2d 616, 618 (7th Cir. 1982)).

The Third Circuit recognized the state-created danger theory for the first time in Kneipp, 95 F.3d 1199 (3d Cir. 1996). In Kneipp, a police officer stopped Joseph and Samantha Kneipp for causing a disturbance in the highway. Id. at 1201. The visibly intoxicated couple were walking home on a cold winter evening after drinking at a tavern. Id. The police officer questioned Joseph and Samantha before being joined by three additional police officers across the street. Id. at 1201-1202. Joseph walked across the street to the newly-arrived officers and told one of them that he needed to go home to relieve the babysitter. Id. 1202. He asked if he could leave. Id. The officer responded, "yeah, sure." Id. Joseph left, assuming that the police officers would take the obviously intoxicated Samantha either to the hospital or the police station. Id. The assumption was wrong. Instead, the police officer sent Samantha home alone. Id. She was found unconscious approximately one and a half hours later at the bottom of an embankment. Id. at 1203. Exposure to the cold caused permanent brain damage. Id. On these facts, the Third Circuit reversed the district court's order granting defendants' motion for summary judgment on plaintiff's state-created danger claim.

Over ten years after Kneipp, the Third Circuit decided the case of Ye v. United States, 484 F.3d 634 (3d Cir. 2007). The case involved treatment of plaintiff, Zi Ye, by Dr. Ikjin Kim, a doctor at a public health center. The doctor had treated Ye six times in the past, between February 6, 2001

and March 5, 2001, and had diagnosed Ye with hypertension, coronary artery disease and angina. Id. at 635. Nevertheless, when Ye visited Dr. Kim on March 5, 2001 complaining of shortness of breath, coughing and discomfort in his upper-body area, Kim told Ye that "there is nothing to worry about and that he is fine." Id. Later that day, Ye was found unconscious and rushed to the hospital, where it was determined that he had experienced a myocardial infarction and congestive heart failure. Id. Ye suffered respiratory failure and a degenerative nerve condition that forced him to survive on a ventilator under permanent care at a nursing center. Id. In the subsequent § 1983 lawsuit, Ye argued that Dr. Kim's assurance amounted to a state-created danger by inducing reliance that prevented Ye from seeking immediate medical care. Id. The Third Circuit rejected Ye's argument, holding that "a mere assurance cannot form the basis of a state-created danger claim." Id. at 640.

The dispute in this case is over where to draw the line between affirmative acts, which support a state-created danger theory, and a failure to act, which does not.[3] Defendant, relying on Ye v. United States, argues that "mere assurances" cannot constitute an affirmative act. 484 F.3d 634, 640 (3d Cir. 2007). Instead, an affirmative act occurs only when the state acts to restrain a person in a matter "similar" to incarceration or institutionalization. Id. at 641. Plaintiff argues for two alternative conclusions. First, plaintiff distinguishes between the "mere assurances" in Ye and

---

[3] At least one decision of the Third Circuit states that "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or omission." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 915 (3d Cir. 1997). Later opinions, however, have continued to focus on whether conduct constituted an affirmative act or an omission. See e.g., Walter v. Pike County Pennsylvania, 544 F.3d 182, 194 (3d Cir. 2008; Ye v. United States 484 F.3d 634 (3d Cir. 2007). See also Sarah E. Ricks, The Perils of Unpublished Non-Precedential Federal Appellate Opinions: A Case Study of the Substantive Due Process State-Created Danger Doctrine in One Circuit, 81 Wash. L. Rev. 217, 257-58 (2006).

the allegations in the Complaint of deliberate falsehood coupled with reliance. Second, if Ye cannot be distinguished, plaintiff argues that the Court should follow the Third Circuit's earlier decision in Kneipp, in which, she avers, the Third Circuit concluded that a plaintiff's reliance on the assurance of a police officer was deemed to constitute an affirmative act. 95 F.3d at 1202 n.7. The Court finds neither of these arguments persuasive.

### (a) Plaintiff's First Argument: Deliberate Falsehoods as Affirmative Acts

Plaintiff distinguishes between good-faith, but ultimately incorrect, "mere assurances", such as Dr. Kim's assurance to Ye that "there is nothing to worry about," and a policy or custom requiring 911 dispatchers to knowingly and falsely tell callers that "help is on the way," when it is not. (Compl. ¶¶ 71-79.). At oral argument, plaintiff's counsel contended that the 911 operator's statement was a misrepresentation, not a "mere assurance," and that misrepresentations by a 911 operator rise to the level of a state-created danger because a person calling 911 is relying on the City to provide help in an emergency. (Transcript of Oral Argument, March 11, 2010, 27-30.) The Court finds that the distinction between mere assurances and false assurances is of no legal significance in this case.

First, plaintiff has provided no authority for this distinction and the Court's own research has failed to provide any. Second, and just as important, plaintiff's argument ignores part of the stated rationale behind the Ye court's conclusion that mere assurances do not constitute an affirmative act. Drawing support from DeShaney, the Ye opinion noted that Winnebago had "specifically proclaimed, by word and by deed, its intention to protect DeShaney against that danger." Ye, 484 F.3d at 641 (quoting DeShaney, 489 U.S. at 197). Later in the Ye opinion, the Court explained that

"the language of both the majority and the dissent [of DeShaney] leave little doubt that an animating principle of the majority's decision was that an assurance, in this case *an expression of intent to help*, is not an affirmative act sufficient to trigger constitutional obligations." Id. (emphasis added). Ye makes no distinction between false assurances and other types of assurances.

### (b) Plaintiff's Second Argument: The Scope of the Affirmative Act Element

Plaintiff argues that reliance on Ye to dismiss the Complaint would be mistaken for two reasons. First, Ye's holding conflicts with Kneipp. Second, Ye's reasoning conflates the state-created danger and special relationship exceptions to the DeShaney rule. The Court addresses each of these arguments in turn.

### i. The Affirmative Act in Kneipp v. Tedder

The first reason Ye should not be followed, plaintiff argues, is that its holding – "mere assurances" cannot constitute an affirmative act – contradicts the Kneipp Court's implicit holding that mere assurances can constitute such an act.

Plaintiff focuses attention on footnote seven of the Kneipp opinion, where the court characterized the affirmative act as the police officer's assurance to Joseph that he could leave and his wife would be taken care of. As the Third Circuit explained, Joseph's question "can I leave?" to the police officer could mean nothing other than "will you take care of my wife so I can leave?" Kniepp, 95 F.3d at 1202 n.7. "When the police said 'you can leave,' that reasonably implied that they would take care of his wife. This *affirmative action* on the part of the police led Mr. Kniepp to leave his wife unattended, something he alleged he would otherwise not have done." Id. (emphasis added). Thus, plaintiff argues that if Samantha Kneipp could recover based on assurance, but Zi Ye

could not, the two cases are in tension with one another.

The Court rejects plaintiff's characterization of Kneipp. The case did not hold that a state-created danger claim arises when a plaintiff relies on an assurance from the state. Footnote seven can be misleading unless it is read in context. The footnote is in the section of the opinion describing the background facts. It was not part of the Kneipp court's holding. Later in the opinion, when the court analyzed the facts to determine whether the state had acted affirmatively to increase Samantha's vulnerability, it explained that "the conduct of the police, in allowing Joseph to go home alone and in *detaining* Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm." Id. at 1209 (emphasis added). On the next page, it offered a slightly different formulation, stating that

> the police officers *intervened* to cut off Samantha's private source of protection by giving Joseph permission to go home alone, thereby increasing the danger that Samantha would suffer harm in her visibly intoxicated state when they abandoned her. The *affirmative acts* of the police officers here created a dangerous situation, requiring that they take additional measures to ensure Samantha's safety.

Id. at 1210 (emphasis added). Taken together, these two passages demonstrate that Kneipp's holding was that physical intervention by the state in detaining Samantha in such a way as to limit her freedom of action and then releasing her in a visibly intoxicated state after allowing her husband to leave the scene constituted an affirmative act (or acts).[4]

Kneipp's holding construing the affirmative act element of the state-created danger theory does not contradict the holding in Ye. Kneipp, like Ye, required something more than a "mere assurance" to establish an affirmative act.

---

[4] The Third Circuit itself has expressed apprehension over defining the precise scope of the affirmative act in Kneipp. In Morse, the court remarked that "[w]hether the officers's [sic] actions in Kneipp constituted an affirmative act or an act of omission is a close question." 132 F.3d at 914 n.14.

### ii. <u>Ye</u> and the Scope of the Affirmative Act Element

Plaintiff argues that <u>Ye</u> should not be followed because its reasoning requires restraint "similar" to incarceration or institutionalization, a requirement that would effectively merge the special relationship and state-created danger exceptions. According to plaintiff, the threshold for establishing an affirmative act is lower: allegations of an assurance by a 911 operator that induces detrimental reliance are enough. The Court need not address this issue under the facts of this case, which involves mere assurances.

Even if <u>Ye</u>'s reasoning is rejected, the Third Circuit's precedential opinions still require more than an assurance coupled with reliance in order to demonstrate an affirmative act. There is no support in the Third Circuit's precedential opinions for the proposition that assurances by a 911 operator, which induce a person to voluntarily limit her freedom, establish an affirmative act. To the contrary, the Third Circuit's cases uniformly require physical intervention in which the state, though its action, imposes limits on a person's freedom of action that make the person more vulnerable to danger.

In <u>D.R. v. Middle Bucks Area Vocational Technical School</u>, the Third Circuit held that middle school defendants were not liable under either the special relationship or state-created danger exceptions where school officials failed to stop several male students from molesting two female students in a graphic arts classroom. 972 F.2d 1364, 1366 (3d Cir. 1992) (en banc). In rejecting the plaintiff's state-created danger theory, the court remarked that "plaintiffs' allegations are insufficient to show, as required under <u>DeShaney</u>, that the school defendant either *impermissibly limited the freedom of the plaintiffs to act on their own behalf or barred their access to outside support*." <u>Id.</u> at 1376 (emphasis added). This language establishes that state-created danger liability requires state

action that limits a plaintiff's freedom. See Bright, 443 F.3d at 282 n.6 (noting that any inconsistencies in Third Circuit precedent are resolved by reference to the *en banc* decision in D.R.).

Rivas v. City of Passaic, 365 F.3d 181 (3d Cir. 2004) and Bright, each decided after D.R. and Kneipp, support the above conclusion. In denying the City's motion for summary judgment in Rivas, the Third Circuit concluded there was sufficient evidence that two EMTs created a danger when they informed police officers that they had been attacked by a patient, failed to tell the police officers that the patient was having a seizure, and then abandoned control over the situation by allowing the police officers to restrain the patient face-down, first on the floor, and then on a stretcher. 365 F.3d at 185-87. Although the Court did not explicitly rule that state-created danger exists only when the state physically intervenes, it noted that, absent the intervention of the state, the plaintiff would have been able to use his freedom of action to remain in the apartment's bathroom for the duration of his seizure without incident. Id. at 197. A similar observation animated the Third Circuit's decision in Bright, where the father of a daughter killed by a man the father had been assured by the police would be arrested did not claim "that the state in any way restricted his freedom to act on his family's own behalf." Without such a restriction, the Third Circuit concluded that there could be no state-created danger liability. 443 F.3d at 284.

In D.R., Kneipp, Rivas and Bright, the Third Circuit's analysis of the affirmative act element was focused on the presence of state intervention imposing limits on a person's liberty. In the two cases containing facts sufficient to demonstrate an affirmative act – Kneipp and Rivas – the state, through its employees, physically detained citizens in situations that made those citizens more vulnerable to harm. Collectively, these Third Circuit precedents require a physical interaction with the state in which an act of the state limits the plaintiff's freedom of action, including the option to

-17-

seek outside help. Accordingly, whether Ye's reasoning improperly conflates the special relationship and state-created danger exceptions is of no legal significance in this case. Even if it does, and even if merging the two exceptions is inconsistent with other Third Circuit precedent and the distinct concerns underlying each exception, the Court need not rely on Ye alone to conclude that mere assurances, without more, do not constitute the affirmative act necessary to establish liability under the state-created danger exception to the DeShaney rule.

### 2. Application of the Motion to Dismiss Standard to Plaintiff's State-Created Danger Claim

The affirmative act alleged by plaintiff in this case is that

> with an intentional, a deliberate, or a conscious indifference to the lives and safety of its citizens, including the decedent, Marvin Yamar Perez, the Defendant City of Philadelphia maintained, through its final policymakers, unconstitutional policies that prevented sources of rescue, and instead, informed its citizens to call 911 for an emergency while knowing that were insufficient resources to properly respond.

(Compl. ¶ 77.) The Complaint further alleges that the affirmative act of knowingly implementing and maintaining a system that (1) employs deficient emergency response services (Compl. ¶¶ 32 - 48); (2) without referring calls for help to private services (Compl. ¶¶ 17, 20, 51, 54); (3) while executing training, policies, and procedures that instruct 911 operators to falsely tell callers, such as Veronica Perez, that "help is one the way" (Compl. ¶ 74), created dangers that would not have otherwise existed and that caused Perez's death. (Compl. ¶ 75.)

Iqbal requires that the Court first disregard factual allegations which constitute nothing more than "legal conclusions" or "naked assertions." 129 S. Ct. at 1950. Here, the Court must disregard the conclusory adjective "unconstitutional" used to describe the City's policies and customs throughout the Complaint. Shorn of this term, the "nub" of plaintiff's allegation is that a policy or

procedure of training 911 operators to always say that help is on the way constituted an affirmative act by inducing reliance that caused plaintiff to voluntarily limit her freedom of action.

The Court concludes that plaintiff's allegations fail to "state a claim to relief that is plausible on its face." Id. at 1949. Plaintiff must allege a physical interaction with the state that limited her freedom of action. The allegations in the Complaint are similar to the "mere assurances" presented in Ye and do not amount to the state intervention and restriction on liberty that was present in Kneipp. Nowhere in the Complaint does plaintiff allege an action by the City that would have limited the options available to her after she called 911. After the 911 operator said "help is on the way" Perez's family could have taken him to the hospital, called a private ambulance, or engaged in some other form of self-help. They did none of these things immediately. Instead, the Complaint alleges that they voluntarily limited their freedom of action by relying on the 911 call. Reliance on a 911 operator, by itself, cannot establish a constitutionally recognized harm because plaintiffs had no constitutionally-recognized reliance interest in the first place: the Third Circuit has clearly stated that there is "no federal constitutional right to rescue services, competent or otherwise." Brown, 318 F.3d at 483. Reliance on assurances from the state, without more, is insufficient to establish state-created danger liability. Ye, 484 F.3d at 640; Bright, 443 F.3d at 284.

Plaintiff's allegations are insufficient to constitute the affirmative act required to state a violation of the constitutional right to be free from state-created danger. Without a constitutional violation, plaintiff's Complaint fails to state a claim under Monell. See Collins, 503 U.S. at 120 (listing constitutional injury as one of the two required elements of a valid Monell claim).

**B. Plaintiff's Claim Under the Special Relationship Exception**

As described above, the Supreme Court's opinion in DeShaney recognizes that the state may

be held liable when it "take a person into its custody and holds him there against his will." 489 U.S. at 199-200. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraints of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." Id. at 200.

The facts alleged in the Complaint do not state a claim under this exception. Assurances of help from a 911 operator do not establish a special relationship that places an affirmative duty on the state. See Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 379-80 (E.D. Pa. 1995), aff'd 91 F.3d 125 (3d Cir. 1996). In Regalbuto, plaintiffs alleged that a 911 operator stated that help was on the way when it was not, and that, once EMS arrived, the defibrillator failed to work properly. The district court dismissed the claim, holding that assurances by the 911 operator did not create a special relationship because the assurances failed "to curtail the individual's freedom such that he or she can no longer care for him or herself." 937 F. Supp. at 379-80. The Third Circuit affirmed. 91 F.3d 125.

This case is substantially indistinguishable from Regalbuto. The Complaint does not allege that plaintiff or Perez was restrained in such a manner as to create a special relationship with the state, nor could it. Accordingly, plaintiff has failed to state a claim based on the special relationship exception to DeShaney.

**V. CONCLUSION**

For all of the reasons stated above, the Complaint fails to allege the constitutional injury required to state a Monell claim against the City of Philadelphia. Defendant's motion to dismiss is, therefore, granted. An appropriate order follows.